1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11    PLUMTREE SOFTWARE, INC, a              No   C-04-2777 VRW
      Delaware corporation,
12                                           ORDER
                   Plaintiff
13

14               v

15

16    DATAMIZE, LLC, a Wyoming limited
      liability corporation,
17
                   Defendant.
18    _____/

19          Plaintiff Plumtree Software, Inc ("Plumtree") brings this

20    action to obtain a declaratory judgment that its products do not

21    infringe on two of defendant Datamize, LLC's ("Datamize") patents.

22    Doc #1 (Compl).  Datamize moves the court to dismiss Plumtree's

23    complaint pursuant to FRCP 12(b)(1).  Doc #13 (Mot Dis).  Plumtree

24    opposes.  Doc #33 (Opp Dis).  Additionally, Plumtree moves for

25    summary judgment in its favor on the ground that Datamize's

26    patents, US Patent Nos 6,460,040 ("'040 patent") and 6,654,418

27    ("'418 patent"), are invalid pursuant to the on-sale bar doctrine,

28    35 USC § 102(b).  Doc #8 (MSJ).  Datamize opposes.  Doc #30 (MSJ

Opp).  Based on the parties' memoranda and the applicable federal law, the court DENIES Datamize's motion to dismiss and GRANTS Plumtree's motion for summary judgment.

I

A

Plumtree is a publicly traded computer software company located in San Francisco, California.  Mot Dis at 2.  Plumtree develops, markets and licenses "corporate portal" software.  A "corporate portal" is web-based software that brings together a variety of applications and information in a comprehensive platform within an organization.  MSJ at 3.  Plumtree's customers use its software to develop their own corporate Intranet sites, which allow employees to access, manage and search a variety of information from within and outside of the organization.  Id.

Datamize is a start-up software company located in Missoula, Montana.  Mot Dis at 2.  In early 1993, Datamize's single employee, Kevin Burns, invented the two patents at issue in this case:  the '040 and the '418 patents.  Id.  The '040 and the '418 patents were entitled "Authoring System for Computer-based Information Delivery System" and were continuations of Burns's US Patent No. 6,014,137 ("'137 patent").  In December 1994, Burns first completed a version of his kiosk authoring tool "reduc[ing] to practice the inventions claimed in the claims of the three patents."  Levin Decl, Ex 3 (Burns Depo) at 78:18-24.  The '137, '040 and '418 patents were issued on January 11, 2000, October 1, 2002, and December 2, 2003, respectively.  Doc #9 (Levin Decl), Ex 1-2; Doc #1, Ex A (VRW 02-05693).

2

United States District Court

For the Northern District of California

1

        The kiosk authoring tool that Burns designed using the
2
'040 and '418 patents is a "multimedia kiosk authoring system for
3
use in developing and maintaining user interface screens for
4
multimedia kiosk systems."  Levin Decl, Ex 1-2.  Burns designed the
5
authoring system to "be used by persons with little or no
6
experience in the intricate details of computer programming thereby
7
making it easier for a large number of persons to set up kiosk
8
interface screens."  Burns Decl at ¶ 3.  The system "accomplishes
9
this by providing pre-defined building blocks or screen elements
10
(ie, pre-defined windows, buttons, and images) to be used in
11
constructing an interface screen."  Id.  Burns described the
12
invention as "a method used to build interface screens for a kiosk
13
or computer system."  Id.

14
        In 1993, Kevin Burns and his father, Emmett Burns, formed
15
Multimedia Adventures ("MA") to pursue the commercialization of the
16
inventions disclosed in the '137, '040 and '418 patents.  Burns
17
Decl at ¶ 4; Levin Decl, Ex 5 (Emm Burns Depo) at 28:18-29:16.
18
Kevin Burns described MA as "a marketing company that developed the
19
computer system to market different entities with the first focus
20
being the ski industry."  Burns Depo at 20:8-10.  In 1994, MA hired
21
Jim Lorence to handle MA's sales and marketing.  Levin Decl, Ex 4
22
(Burns Depo 2) at 194:9-13.  Between October 1994 and February
23
1995, Lorence pitched MA's kiosk systems to Bally's Entertainment
24
Corporation, Ski Lake Tahoe and Ski Industries America ("SIA").
25
Levin Decl, Ex 17-18.

26
        In the winter of 1994-1995, MA learned that SIA planned
27
to hold a trade show in March 1995.  Doc #30 (MSJ Opp) at 4.  The
28
trade show included the "Mountain Visions" store, at which thirty-

United States District Court

For the Northern District of California

one companies paid $2,000 to $10,000 for booth space to feature their products.  Emm Burns Depo at 129-130.  On January 17, 1995, MA made a presentation to SIA consisting of "a series of foils describing MA, its business, and a demonstration of skiing-related full motion video and images[.]"  MSJ Opp at 4-5.  Specifically, MA presented its kiosk system, which "allowed users to walk up to the kiosks and navigate through screens to view information on products offered by various vendors, and to perform transactions on the kiosk."  Travis Decl at ¶ 12.  According to Emmett Burns, MA "wanted to show [SIA] the quality of the video and stuff we had and, hopefully, they would allow us in the [Mountain Visions] store."  Emm Burns Depo at 134:8-10.

MA's demonstration was not interactive, and MA did not offer to sell anything to SIA.  Id at 136:11-137:17; 135:20-22.  MA did, however, agree to a "bargain" with SIA, whereby MA agreed: "If you [SIA] let us [MA] in the show, we [MA] will get content and put that into the system and have it in the Mountain Vision[s] store; and if that occurs, we want to be able to talk about it in the future."  Id at 152.  MA also asked SIA to waive the sponsorship fee that SIA normally charged to sponsors for the Mountain Visions store.  Levin Decl, Ex 11 (Travis Decl) at ¶ 8.

On January 25, 1995, SIA sent a letter to Lorence at MA confirming the terms of their agreement.  Travis Decl at ¶ 9-10, Ex B.  In the agreement, MA agreed to (1) provide the software and hardware needed to host its kiosk system at the March 1995 trade show and (2) work to add content describing the other sponsors' products and services into the kiosk system -- at no charge to the other sponsors.  Travis Decl at ¶ 10, Ex B.  SIA agreed to (1)

**4**

United States District Court

For the Northern District of California

provide MA with one-third of the space in the "electronic information center" in the Mountain Visions store and (2) waive the $10,000 sponsorship fee for MA that SIA normally charged for exhibitors at the Mountain Vision store.  Travis Decl ¶ 8, 10, Ex B.  On or about January 26, 1995, MA signed an exhibit space contract and paid SIA $2,430 for exhibiting fees.  Burns Decl at ¶ 5.

Pursuant to the agreement, MA demonstrated its kiosk system product, SkiPath, in the Mountain Visions store at SIA's March 3-7, 1995, trade show in Las Vegas.  Id at ¶ 6.  At the trade show, MA set up, ran and dismantled its own kiosks.  Id.  MA never gave the kiosks or software to SIA.  Id.  Burns stated that he believed that this kiosk system displayed at SIA's 1995 trade show embodied <u>all</u> the claims of the '137, '040, and '418 patents.  Burns Depo at 81:19-82:1.

B

The present litigation is not the first time Datamize and Plumtree have met on the patent battlefield.  The roots of the present action between Datamize and Plumtree stem back to May 17, 2002.  On that date, Datamize filed suit against Plumtree in the United States Court for the District of Montana in Missoula alleging infringement of the '137 patent (the "Montana action").  Mot Dis at 3.  Ever the friendly combatant, on this same date Datamize sent a letter to Plumtree informing it that:

> Datamize believes that Plumtree is infringing the '137 Patent by, among other things, providing software enabling the operation of portals and kiosks employing customization and personalization features.  We also believe that

> Plumtree will infringe the claims in the
> continuation patent application when it issues
> as a patent [the later issued '040 patent].
> From the prior communications, it does not
> appear that Plumtree has appreciated the
> implications of Datamize's patent rights.

Id at 1-2.

Datamize's letter further informed Plumtree of the reasons behind the Montana action: "Because a direct assertion of patent infringement could subject Datamize to a declaratory judgment action by Plumtree in an inconvenient forum, [Datamize] has proceeded to preserve its rights by filing the attached Complaint in the United States District Court for the District of Montana (Missoula Division) where Datamize is located."  Doc #1 (Compl) Ex C at 2.  To demonstrate further that Plumtree would soon be infringing the '040 patent, Datamize also enclosed the thirty-eight allowed claims later issued as the '040 patent on October 1, 2002.  Id.

On November 23, 2002, Magistrate Judge Leif Erickson of the district court in Missoula issued a report and recommendation that the Montana action be dismissed for lack of personal jurisdiction over Plumtree.  Mot Dis at 3.  In response to Magistrate Judge Erickson's report and recommendation, on December 4, 2002, Plumtree filed suit in this court seeking a declaratory judgment for non-infringement of the '137 patent ("DJ1").  Doc #1 (Compl) (VRW 02-05693).  DJ1 was assigned to the undersigned. Plumtree agreed to stay DJ1 pending a ruling by a Montana district judge on the personal jurisdiction issue.  Mot Dis at 3.  On July 8, 2003, Judge Donald Molloy adopted Magistrate Judge Erickson's findings and dismissed the Montana action for lack of personal

United States District Court

For the Northern District of California

jurisdiction.  Id.  On August 7, 2003, Datamize filed a motion to realign itself as plaintiff in DJ1.  The court granted realignment on October 6, 2003.  Doc #32 (10/6/03 Order) at 8-9 (VRW 02-05693).

On September 3, 2003, Datamize filed a patent infringement claim against nine online security brokerage firms in the Eastern District of Texas, Marshall Division based on the '040 patent ("TX action").  Id at 4.  On April 15, 2004, Datamize moved to add additional infringement claims in the TX action based on the '418 patent, which issued on December 2, 2003.  Opp Dis at 3.  The judge in the TX action subsequently allowed Datamize to add these additional claims.  Id.  Plumtree, however, is <u>not</u> a defendant in the TX action.  Mot Dis at 4.

On March 31, 2004, Plumtree filed a motion for summary judgment in DJ1 claiming that the '137 patent was indefinite.  Id.  On July 9, 2004, the court granted Plumtree's motion.  Id.  On August 5, 2005, the Federal Circuit affirmed the court's grant of summary judgment in favor of Plumtree.  Doc #109 (VRW 02-05693).

On the same day that this court granted Plumtree's motion for summary judgment in DJ1, Plumtree filed a new complaint seeking a declaratory judgment of non-infringement of Datamize's '040 and '418 patents ("DJ2").  Doc #1 (Compl).  DJ2 is the action currently before this court.

Datamize moves to dismiss DJ2 pursuant to FRCP 12(b)(1).  Mot Dis at 1.  Plumtree moves for summary judgement in DJ2 on the ground that the '040 and '418 patents are invalid under the on-sale bar, 35 USC § 102(b).  MSJ at 1.

//

//

7

II

The court must first address Datamize's motion to dismiss DJ2 for lack of subject matter jurisdiction.  See Ruhrgas Ag v Marathon Oil Co, 526 US 574, 578 (1999) ("Customarily, a federal court first resolves doubt about its jurisdiction over the subject matter * * *.").

The Constitution limits the exercise of judicial power to "cases" and "controversies."  Aetna Life Insurance Co of Hartford, Conn v Haworth, 300 US 227, 239 (1937).  The Declaratory Judgment Act of 1934 ("DJA"), 28 USC § 2201, provides in relevant part:

> In a case of actual controversy within its jurisdiction * * * any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 USC § 2201(a).

"In the declaratory judgment context, the question in each case is whether the facts alleged, under all of the circumstances show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  Sierra Applied Sciences, Inc v Advanced Energy Industries, Inc, 363 F3d 1361, 1372 (Fed Cir 2004) (hereinafter "Sierra Applied").

Federal Circuit law governs whether a case or controversy exists for declaratory judgment actions based on patent law.  Shell Oil Co v Amoco Corp, 970 F2d 885, 888 n4 (Fed Cir 1992).  The

United States District Court

For the Northern District of California

Federal Circuit has developed a two-part test to determine whether a case or controversy exists under the DJA.  For a district court to have jurisdiction over a patent declaratory judgment matter, "[t]here must be both (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity." Sierra Applied Sciences, 363 F3d at 1373 (quoting BP Chemicals, Ltd v Union Carbide Corp, 4 F3d 975, 978 (Fed Cir 1993)).

When there is an express charge of infringement, an actual controversy exists and the Federal Circuit has found the first prong satisfied.  See Arrowhead Industrial Water, Inc v Ecolochem, Inc, 846 F2d 731, 736 (Fed Cir 1988).  In the absence of an express charge of infringement, courts make "[a]n examination of the totality of the circumstances * * * to determine whether there is a controversy." Vanguard Research, Inc v PEAT, Inc, 304 F3d 1249, 1254-55 (Fed Cir 2002); Arrowhead, 846 F2d at 736 ("When the defendant's conduct, including its statements, falls short of an express charge, one must consider the 'totality of the circumstances' in determining whether that conduct meets the first prong of the test.").

"To constitute an actual controversy, the plaintiff has the burden of establishing by a preponderance of the evidence * * * that it has a reasonable apprehension that it will be sued.  The test is an objective one * * *." Shell Oil Co, 970 F2d at 887-88.  If the defendant, through a FRCP 12(b)(1) motion, "denies or controverts [plaintiff's] allegations of jurisdiction, * * * the

United States District Court

For the Northern District of California

movant is deemed to be challenging the factual basis for the court's subject matter jurisdiction." **Cedars-Sinai Medical Center v Watkins**, 11 F3d 1573, 1583 (Fed Cir 1993):

> In such a case, the allegations in the complaint are not controlling * * * and only uncontroverted factual allegations are accepted as true for purposes of the motion * * *.  In establishing the predicate jurisdictional facts, a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings, including affidavits and deposition testimony.

Id at 1583-84.

Datamize only discusses the first prong in its motion to dismiss, Doc #13, and thus it appears that the second prong of the **Sierra Applied** test -- that Plumtree sells allegedly infringing software -- is not in dispute.  Accordingly, in determining whether the jurisdiction requirements of the DJA are met, the court need only address the first prong of the **Sierra Applied** test.

III

The first prong of the **Sierra Applied** test requires "an **explicit threat or other action** by the patentee, which creates a **reasonable apprehension** on the part of the declaratory plaintiff that it will face an infringement suit." **Sierra Applied**, 363 F3d at 1373 (emphasis added).  Datamize presents two primary arguments why this prong is not satisfied in DJ2.  First, Datamize contends that its May 17, 2002, letter to Plumtree and the separate TX action do not constitute an explicit threat causing reasonable apprehension of a future infringement suit involving either the '040 or '418 patent.  Mot Dis at 6-8.  Second, Datamize asserts

10

United States District Court

For the Northern District of California

that the passage of time between the filing of DJ1 and DJ2 demonstrates that Plumtree was not motivated by an "objectively reasonable apprehension of suit."  Id at 6-7.  In the alternative, Datamize argues that even if the court were to find that subject matter jurisdiction exists, the court should decline to exercise jurisdiction because Plumtree is using the DJA "as a tool to gain [an] * * * improper procedural advantage." Id at 9.

The court addresses each argument, and why it fails to persuade, in turn.


1

Datamize asserts that the May 17, 2002, letter and the TX action are insufficient to constitute an "explicit threat" of an infringement suit on the '040 and '418 patents.  The court addresses each patent separately.


The '040 Patent

As to the '040 patent, Datamize admits that the May 17, 2002, letter "notifying Plumtree that Datamize had filed suit on the '137 Patent also happened to mention, among other things, potential infringement of the yet to be issued '040 Patent."  Id at 6.  But, Damatize asserts, "that letter does not provide a basis for this action [DJ2]" because it was not an "act [] threatening suit."  Id.  Datamize cites Shell Oil and Phillips Plastics Corp v Kato Hatsujou Kabushiki Kaisha, 57 F3d 1051 (Fed Cir 1995), in support of its argument.

In Shell Oil, in anticipation of commercializing its catalysts, Shell Oil ("Shell") proposed an agreement, in which

11

Amoco would agree not to assert its patent against Shell's catalysts and Shell would pay $100,000 for a paid-up license. Shell Oil, 970 F2d at 886.  After failed counter-offers, Amoco wrote to Shell:  "It is our understanding from our previous discussion that the catalyst falling within the Amoco patent would be used in [Shell's plants]."  Id (emphasis added).  When Shell filed a declaratory judgment action, the court found no reasonable apprehension:  "[A] statement that Shell's activities 'fall within' Amoco's claims in the context of the parties' licensing negotiations can hardly be considered an express charge of infringement."  Id at 888.

In Phillips Plastics, Kato Hatsujou KK ("Kato") contacted Phillips Plastics ("Phillips"), stating that certain fasteners made by Phillips were "covered by" Kato's patent and inviting Phillips to take a license under the patent.  57 F3d 1052.  When Kato reissued its patent five years later, it wrote again to Phillips offering a license and enclosing a copy of the reissued patent. Id.  Instead of responding to Kato's request to put together a licensing agreement, Phillips filed a declaratory judgment action. The court held no reasonable apprehension despite Kato's offers of a patent license and statements that Phillips's fasteners "were covered by" the claims of the patent.  Id at 1053-54.

The threat of legal action in the present case is far stronger than the threats in Shell Oil and Phillips Plastics.  In Shell Oil, patent holder Amoco only mentioned that Shell's activities might "fall within" Amoco's patent claims when the two companies began negotiating a license.  970 F2d at 889.  The court held: "It is possible that, even after the conversations reached an

12

United States District Court

For the Northern District of California

impasse, Amoco might never have sued, either because the validity of its patent was doubtful or its infringement argument was too weak.  In fact, if Shell had never approached Amoco, Amoco might never have considered any action against Shell."  Id.

Similarly, in Phillips Plastics, patentee Kato merely invited Phillips to take a license under its patent after informing Phillips that certain products of theirs were "covered by" Kato's patent.  57 F3d at 1051.  In neither of these cases did the patentee accompany its statement of potential infringement with (1) a suit of a parent patent or (2) a statement regarding a specific forum for infringement litigation.

Accordingly, the court concludes that Datamize's May 17, 2002, letter represented an "explicit threat or other action" that would cause reasonable apprehension of an infringement suit on the '040 patent.  Datamize is correct in asserting that the letter only expressly stated its "belief" that Plumtree would infringe its soon-to-be-issued '040 patent.  Compl, Ex C at 1 ("We also believe that Plumtree will infringe the claims in the continuation patent application when it issues as a patent [the later issued '040 patent]").  The remaining language of the letter, however, demonstrates an explicit threat.  Datamize wrote further:  "From the prior communications, it does not appear that Plumtree has appreciated the implications of Datamize's patent rights."  Id at 1-2.  To clarify these "implications," Datamize included a copy of the thirty-eight additional claims issued later as the '040 patent.  Id at 1.

More importantly, Datamize made clear that it was willing to file suit to settle alleged infringement:  "Because a direct

13

**United States District Court**
For the Northern District of California

1   asserter of patent infringement could subject Datamize to a

2   declaratory judgment action by Plumtree in an inconvenient forum,

3   [Datamize] has proceeded to preserve its rights by filing the

4   attached Complaint [regarding the '137 patent] in the United States

5   District Court for the District of Montana (Missoula Division)

6   where Datamize is located." Id at 2.  This statement demonstrated

7   that Datamize's decision to file suit was motivated not only by

8   Plumtree's alleged infringement, but also by its intent to ensure

9   litigation in its preferred forum.

10

11              **The '418 Patent**

12        Regarding the '418 patent, Datamize argues that "Plumtree

13  cannot bootstrap the May 17, 2002, letter into subject matter

14  jurisdiction over the '418 Patent."  Id at 7.  Datamize insists

15  that its statement that "[w]e also believe that Plumtree will

16  infringe the claims in the continuation patent application when it

17  issues as a patent" referenced only the yet-to-be-issued '040

18  patent, not the '418 patent.  Id.  Datamize states further: "In

19  fact, the patent application that eventually issued as the '418

20  patent had not even been filed at the time of the letter."  Id.

21        The court agrees with Datamize that the May 17, 2002,

22  letter had "absolutely nothing to do with the '418 patent."  Mot

23  Dis at 7.  But this fact is of little moment, for even if a

24  defendant does not "expressly charge" the plaintiff with

25  infringement, "if the circumstances warrant, a reasonable

26  apprehension may be found in the absence of any communication from

27  defendant to plaintiff."  Arrowhead, 846 F2d at 736.  In Goodyear

28  Tire & Rubber Co v Releasomers Inc, 824 F2d 953, 956 (Fed Cir

14

United States District Court

For the Northern District of California

1987), the Federal Circuit similarly stated that "we cannot read the Declaratory Judgment Act so narrowly as to require that a party actually be confronted with an express threat of litigation to meet the requirements of an actual case or controversy."

Applying the totality of the circumstances approach required by the Federal Circuit, the court concludes that Plumtree had a "reasonable apprehension" that it was going to face an infringement suit from Datamize regarding the '418 patent. First, Datamize had already sued Plumtree on the '137 patent. As the parent patent to '040 and '418, the '137 patent shares the identical specification. Opp Dis at 9. In Goodyear, the Federal Circuit held that a prior infringement suit between two parties was relevant to determining reasonable apprehension under the DJA: "By suing [] in state court for the same technology as is now covered by the patents, [plaintiff, patentee] has engaged in a course of conduct that shows a willingness to protect that technology." 824 F2d at 956.

Next, the TX action added to Plumtree's "reasonable apprehension." Although this suit was initially based solely on the '040 patent, Datamize successfully sought to have the '418 patent added four months after the '418 patent was issued. Doc #29 (Volk Decl), Ex A. In its motion to amend to add the '418 patent in the TX action, Datamize stated that "it would be highly surprising if Defendants' counsel had not specifically considered the possibility that Datamize would add the '418 Patent to this case." Id at 3 (emphasis in original). Hence, Plumtree recognized the strong likelihood that a suit regarding the '040 patent would later include the similar '418 patent.

United States District Court

For the Northern District of California

1    Furthermore, Plumtree also learned that Datamize had

2  <u>expressly</u> <u>identified</u> Plumtree's products as infringing the '040 <u>and</u>

3  the '418 patent in the TX action.  Volk Decl ¶ 3, Ex B at 8-9.  In

4  its response to Interrogatory No 5 in the TX action, Datamize

5  stated: "The following products incorporate or embody one or more

6  claimed inventions of the patents-in-suit: [] Plumtree Corporate

7  Portal [and] Plumtree Enterprise Web Suite[.]"  Id.  Datamize's

8  response is a clear assertion that Plumtree's products infringed

9  <u>both</u> the '040 and the '418 patent.

10    In opposition to this evidence, Datamize argues that

11  previously filed lawsuits against "unrelated third parties" have

12  been held "insufficient to suggest a future lawsuit" in a district

13  court case.  Mot Dis at 8 (citing <u>Charles Machine Works, Inc v</u>

14  <u>Digital Control, Inc</u>, 264 F Supp 2d 980, 981 (WD Ok 2003)).  The

15  Federal Circuit, however, has held that such third party suits are

16  relevant:  "related litigation may be evidence of a reasonable

17  apprehension."  <u>Shell Oil</u>, 970 F2d at 888.  And it is Federal

18  Circuit law that controls this court's decision.

19    For the foregoing reasons, the court holds that the

20  amalgamation of (1) the May 17, 2002, letter, (2) the '137

21  infringement suit and (3) the TX action represents an "explicit

22  threat or other action" that would cause Plumtree to have a

23  "reasonable apprehension" of suit.

24

25                                 2

26    Datamize also contends that Plumtree was not <u>motivated</u> by

27  "reasonable apprehension" in filing DJ2.  Specifically, Datamize

28  focuses on the passage of time before Plumtree filed DJ2.  Mot Dis

                                 16

at 6.  First, Datamize states that Plumtree knew about the '040 patent (issued on October 1, 2002) for almost two years and the '418 patent (issued on Dec 2, 2003) for approximately eight months before filing DJ2 on July 9, 2004.  Despite this knowledge, Plumtree did not seek to add either of these patents to DJ1 (filed on December 4, 2002 and decided on July 9, 2004).  Id.

Furthermore, Datamize argues that its threatening letter "was sent on May 17, 2002, over two years before Plumtree ever filed its emergency declaratory judgment action."  Id.  Datamize states that "if that letter had truly created an objectively reasonable apprehension of suit on the '040, Plumtree would have included the '040 Patent in Plumtree DJ1, as opposed to filing [DJ2] approximately two years later."  Id at 7.  Based on this chronology, Datamize insists that in filing DJ2, Plumtree had at most a "nervous state of mind of a possible infringer," which under Federal Circuit precedent is insufficient to meet the "reasonable apprehension of suit test."  Id at 8 (citing <u>Phillips Plastics Corp</u>, 57 F3d at 1053).  The court finds this argument unpersuasive.

First, the <u>Sierra Applied</u> test is an <u>objective</u> one, not <u>subjective</u>.  See <u>Shell Oil Co</u>, 970 F2d at 887-88.  Next, although Datamize is correct that DJ2 (filed on July 9, 2004) could have been filed earlier, Datamize offers no precedent <u>requiring</u> Plumtree to do so.

Indeed, one court has rejected the temporal argument put forward by Datamize.  In <u>Hakuto Co v Emhart Industries, Inc</u>, 1989 WL 24118, *3 (ND Ill 1989), the court concluded that letters alleging infringement sent <u>three years</u> prior to a declaratory judgment action were "sufficient to create a reasonable

United States District Court

For the Northern District of California

apprehension of [patentee's] intent to bring suit to enforce its patent." Despite the patentee's contention that the letters were "old news," the court found jurisdiction under the DJA because "there [wa]s nothing to indicate that [patentee's] intent ha[d] changed between the date [alleged infringer] received the letters and the date it filed the complaint." Id. Similarly there is no evidence in the present case indicating that Datamize's intention to pursue litigation over alleged infringements of its '040 and '418 has changed. For these reasons, the court holds that Plumtree's apprehension and its filing of DJ2 were reasonable.

3

Finally, Datamize argues that even if the court finds subject matter jurisdiction over DJ2, the court should decline to exercise its jurisdiction because Plumtree is "openly us[ing] the resources of the judicial system as a tool to gain some improper procedural advantage." Mot Dis at 9. Specifically, Datamize asserts that DJ2 is an attempt by Plumtree to gain a "strategic advantage" through "forum shopping." Id at 6. Datamize emphasizes that Plumtree filed DJ2 in this court "just hours" after this court granted summary judgment in DJ1 on July 9, 2004. Id. Datamize states: "It would therefore seem that Plumtree took a calculated risk in filing [] DJ2 in yet another attempt to procure what it perceived as some kind of strategic advantage over Datamize." Id. The court is unconvinced.

Datamize provides the court with no explanation regarding what Plumtree's purported "strategic advantage" is; it offers only bald conclusions. Moreover, Datamize has no business accusing

United States District Court

For the Northern District of California

Plumtree of forum-shopping, as Datamize has <u>twice</u> stated its intention to obtain its own preferred forum -- in Missoula, Montana and Marshall, Texas, respectively.  See May 17, 2002, letter (Doc #1, Ex C) and August 12, 2004, letter (Volk Decl at ¶ 4, Ex C).

Having established subject matter jurisdiction, the court next addresses Plumtree's motion for summary judgment.


IV

35 USC § 102(b) provides: "A person shall be entitled to a patent unless * * * the invention was * * * in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States * * *."  The date exactly one year prior to the date of the patent application is known as the "critical date."  <u>Scaltech, Inc v Retec/Tetra, LLC</u>, 269 F3d 1321, 1327 (Fed Cir 2001).  The on-sale bar applies when two conditions are satisfied prior to the critical date:  (1) the product was the subject of "a commercial offer for sale" and (2) the invention was "ready for patenting" during this offer for sale.  <u>Pfaff v Wells Electronics, Inc</u>, 525 US 55, 67 (1998).  If the above two conditions are met, the court must then determine whether the product offered for sale embodies the claims of the patent.  See <u>Scaltech</u>, 269 F3d at 1329.

Plumtree argues that the '040 and '418 patents are invalid under the on-sale bar.  MSJ at 8-12.  First, Plumtree asserts that Datamize's claimed inventions of the '040 and '418 patents satisfy the second prong of the <u>Pfaff</u> test because the inventions were ready for patenting prior to the critical date.  MSJ at 8-9.  Datamize does not dispute this contention, MSJ Opp at

19

United States District Court

For the Northern District of California

6; thus, the court need only address the first prong of the Pfaff test.  Regarding the first prong, Plumtree argues (1) that Datamize's participation in SIA's trade show represented an offer for sale of the claimed inventions of the '040 and '418 patents, Id at 10, and (2) that Datamize has "already admitted that the subject matter of the agreement with SIA embodied all of the claims of the '040 and '418 patents."  Id at 12.

Datamize opposes Plumtree's arguments as to the first prong of Pfaff.  MSJ Opp at 6-13.  Specifically, Datamize contends that the purchase of space in SIA's trade show did not constitute "a commercial offer for sale."  Id at 7-12.  Next, Datamize asserts that Plumtree has not presented "clear and convincing evidence" that the subject of the alleged offer for sale meets every limitation of the claims of the '040 and '418 patents.  Id at 6.  Alternatively, Damatize asserts that Plumtree's motion for summary judgment is "premature" because Datamize's motion to dismiss has not yet been ruled on and "Plumtree filed its motion before any discovery has occurred in this case."  Id at 13.  The court addresses these arguments in turn.

1

"Only an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under § 102(b)."  Scaltech, 269 F3d at 1328 (citation omitted).  An offer for sale does not, however, have to be accepted to implicate the on-sale bar.  Id.  "To determine if the offer is sufficiently definite, one must examine the language

20

United States District Court

For the Northern District of California

of a proposal in accordance with the principles of general contract law." Id (citation omitted). The Uniform Commercial Code ("UCC") is an "important relevant source of general contract law * * *." Id.

In the instant case, the court concludes that Datamize's presentation at SIA's trade show constituted a "commercial offer for sale" under § 102(b). First, MA's meeting with SIA on January 17, 1995 and subsequent agreement on January 25, 1995, both occurred before the critical date: February 27, 1995. At the January 17, 1995, meeting, "MA offered to provide its interactive electronic kiosk system during the March 1995 trade show, and to commit its development resources to include content from SIA manufacturers and sponsors, and to present that content using MA's technology during the show." Travis Decl at ¶ 8.

Following the meeting, SIA accepted MA's offer and in return "provide[d] MA with a prime location in the Mountain Visions store for it to present its kiosk system and to waiver the fee normally charged to primary sponsors participating in Mountain Visions." Id at ¶ 8-9. This agreement constitutes an "offer for sale," which SIA "ma[de] into a binding contract with simple acceptance." See Scaltech, 269 F3d at 1328. In addition, Datamize received consideration: MA was granted a "prime location" and its fee was waived in exchange for the display of MA's kiosk.

But Datamize asserts that this agreement was not a "commercial offer for sale" because there was "no transfer of title to, lease or license of any software or other intellectual property." MSJ Opp at 7. Datamize states that "the activity which Plumtree relies on is the mere negotiation between two parties for

21

United States District Court

For the Northern District of California

the right to floor space at a trade show."  Id.  Datamize cites UCC § 2-106 (defining "sale" as "passing title from the seller to the buyer for a price") and UCC § 2A-103 (defining lease as "a transfer of the right of possession and use of goods for term in return for consideration") as support for its argument.  Id at 8.  According to Datamize, "MA never sold anything to SIA * * *.  At no time did MA ever grant SIA any title or right to control what was being exhibited at the trade show."  Id at 7-8.

Datamize's argument is flawed.  In essence, Datamize fails to recognize the distinction between "tangible item" (or "apparatus") claims and "process" (or "method") claims.  In <u>In re Kollar</u>, the Federal Circuit held that "a tangible item is on sale when * * * the transaction rises to the level of a commercial offer for sale under the Uniform Commercial Code * * *.  When money changes hands as a result of a transfer of title to the tangible item, a sale normally has occurred."  286 F3d 1326, 1332 (Fed Cir 2002).  In contrast, "a process * * * consists of acts, rather than a tangible item.  It consists of doing something, and therefore has to be carried out or performed.  A process is thus not sold in the same sense as a tangible item."  Id.

<u>Scaltech</u> provides a vivid example of this distinction.  Prior to the critical date, the patentee in <u>Scaltech</u> had contacted two third parties and offered to perform its claimed process for treating oil refinery waste.  269 F3d at 1326.  The Federal Circuit held:

> **[W]e think the fact that the process itself was not offered for sale but only offered to be used by the patentee to process waste does not take it outside the on sale bar rule.  The on sale bar rule applies to the sale of an**

United States District Court

For the Northern District of California

1   "invention," and in this case, the invention
2   was a process * * *.  As a result, the process
    involved in this case is subject to § 102(b).
3   In this case, commercial exploitation was
    involved.  Accordingly, the on sale bar rule is
    implicated.
4

5   Id at 1328.

6       Citing Scaltech, the Kollar court held that "[a]ctually

7   performing the process itself for consideration would similarly

8   trigger the application of § 102(b)."  In re Kollar, 286 F3d at

9   1333.

10      Applying these principles, it is clear the on-sale bar is

11  triggered by the facts of this case.  Kevin Burns described the

12  interactive electronic kiosk system that MA presented at SIA's

13  March 1995 trade show as "a method used to build interface screens

14  for a kiosk or computer system."  Burns Decl ¶ 3 (emphasis added).

15  In its agreement with SIA, MA agreed to (1) provide the

16  software/hardware package necessary to produce the interactive

17  touch-screen information center; (2) provide multiple copies of

18  this software/hardware package; (3) work to put other product

19  sponsors on the interactive system at no charge to these companies;

20  (4) provide looped advertising/entertainment videos for the

21  overhead monitors; and (5) exhibit within the trade show.  Travis

22  Decl at ¶ 10.  These acts constitute an agreement to "perform" a

23  method claim.  Accordingly, MA's agreement with SIA to take part in

24  the March 1995 trade show constituted a "commercial offer for

25  sale."

26  //

27  //

28  //

**2**

Having found a "commercial offer for sale," the court addresses whether the subject matter of the agreement with SIA embodied all of the claims of the '040 and '418 patents.  This inquiry will not detain the court long, for Kevin Burns has testified repeatedly that the kiosk at the trade show embodied all of the claims.  In his June 2004 deposition, Burns testified that the authoring tool he built in December 1994 "embodied all the claims of all three of Datamize's patents ['137, '040 and '418]."  Levin Decl, Ex 3 at 83: 11-15.  Burns testified further that this tool was used to create the SkiPath product that was demonstrated in March 1995 at the SIA trade show.  Id at 83: 16-19.  At two other points in his deposition Burns made clear that the system that he demonstrated at the trade show embodied <u>all</u> of the claims of the '040 and '418 patents.  Id at 81:19-82:1; 84:15-18.

Seven months later, and facing Plumtree's current motion for summary judgment, Burns filed a declaration contradicting his deposition testimony.  Burns Decl at ¶ 8.  Specifically, Burns now states:

> I have determined that the version of SkiPath demonstrated at the trade show did not practice every claim of those patents. * * * My careful review of the patents and the Skipath product demonstrated at the SIA trade show leads me to the conclusions that SkiPath did not practice [18 claims] of the '040 patent or [14 claims] of the '418 patent.

Id.
Burns offers no explanation for the change in his position.

This court has held that parties cannot use such declarations to defeat summary judgment.  See <u>Martinez v Marin</u>

**24**

United States District Court

For the Northern District of California

<u>Sanitary Service</u>, 349 F Supp 2d 1234, 1242 (ND Cal 2004) (Walker, J) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."). Accordingly, Datamize fails to raise a genuine issue of fact as to whether MA's agreement with SIA embodied all of the claims of the '040 and '418 patents.

The court holds that because both conditions of the on-sale bar test have been satisfied, Datamize's '040 and '418 patents are invalid under 35 USC § 102(b).


3


Lastly, the court addresses Datamize's contention that Plumtree's motion for summary judgment is "premature." MSJ Opp at 12-13. Datamize asserts that "Plumtree filed its motion before any discovery has occurred in this case." Id at 13. Datamize contends that Plumtree relies on depositions, namely the deposition of Jim Lorence, in which Datamize has not yet had the opportunity to ask questions. In addition, Datamize accuses Plumtree of submitting declarations from witnesses before discovery has begun. Id. The court construes Datamize's argument as a FRCP 56(f) application for a continuance of summary judgment to permit deposition discovery to be taken.

Under FRCP 56(a), Plumtree is permitted to file a motion for summary judgment at any time "after the expiration of twenty days from the commencement of the action." Because Plumtree filed

//

1  its motion more than three months after commencing DJ2, its motion

2  is timely.

3          Whether to allow further discovery under Rule 56(f) is a

4  subject committed to the district court's discretion.  Nidds v

5  Schindler Elevator Corp, 113 F3d 912, 920 (9th Cir 1996).  The

6  party seeking a Rule 56(f) continuance must demonstrate that: (1)

7  it has set forth in affidavit form the specific facts that it hopes

8  to elicit from further discovery; (2) the facts sought actually

9  exist; and (3) these sought-after facts are essential to resist the

10 summary judgment motion.  California v Campbell, 138 F3d 772, 779

11 (9th Cir 1998).

12         Datamize has fulfilled none of the Campbell requirements.

13 Although Datamize contends that the deposition of Jim Lorence "was

14 adjourned before Datamize even had the opportunity to ask any

15 questions," Datamize does not (1) set forth any specific facts that

16 it hopes to discover by deposing Lorence or (2) why these facts are

17 essential to raise a genuine issue of material fact.  MSJ Opp at

18 13.  Accordingly, the court DENIES Datamize's Rule 56(f) request to

19 postpone Plumtree's motion for summary judgment.

20 //

21 //

22 //

23 //

24 //

25 //

26 //

27 //

28 //

United States District Court

For the Northern District of California

26

United States District Court

For the Northern District of California

1

IV

2           For the foregoing reasons, the court DENIES Datamize's

3    motion to dismiss (Doc #13), DENIES Datamize's FRCP 56(f)

4    application and GRANTS Plumtree's motion for summary judgment (Doc

5    #8).  The clerk is directed to ENTER JUDGMENT for Plumtree,

6    TERMINATE all motions and CLOSE the file.

7

8           IT IS SO ORDERED.

9

10   _____

11   VAUGHN R WALKER

12   United States District Chief Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

27