1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9   DATAMIZE, LLC, a Wyoming                No C 04-2777 VRW
    limited liability corporation,
10                                          ORDER
            Plaintiff,
11
        v
12
    PLUMTREE SOFTWARE, INC, a
13  Delaware corporation; and BEA
    SYSTEMS, INC, a Delaware
14  Corporation,

15          Defendants.

16  _____/

17

18          This action involves a patent dispute between Datamize,

19  LLC ("Datamize"), the patent holder, and Plumtree Software,

    Incorporated  ("Plumtree") over United States Patent No 6,460,040
20
    ("the '040 patent") and United States Patent No 6,654,418 ("the '418
21
    patent").  Plumtree seeks a declaration that these patents are
22
    invalid.  Previously, the court concluded that it had jurisdiction
23
    to make this declaration and that the patents were invalid under the
24
    on-sale bar, 35 USC § 102(b).  Doc #45.  The court of appeals upheld
25
    the jurisdictional ruling, but reversed the grant of summary
26
    judgment in favor of Plumtree and remanded, noting that "it will be
27
    important for the district court to construe the patent claims at
28
    issue."  Plumtree v Datamize, 473 F2d 1152, 1164 (Fed Cir 2006).  In

compliance with that directive, the court, after recounting a bit more of the background, turns to construction of the claims and a motion for summary judgment by which Plumtree seeks to invalidate the patents for indefiniteness, 35 USC § 112 ¶2.

I

A

Plumtree is a publicly traded computer software company located in San Francisco, California. Plumtree develops, markets and licenses "corporate portal" software. A "corporate portal" is web-based software that brings together a variety of applications and information in a comprehensive platform within an organization. Plumtree's customers use its software to develop their own corporate Intranet sites, which allow employees to access, manage and search a variety of information from within and outside of the organization.

Datamize is a start-up software company located in Missoula, Montana. In early 1993, Datamize's single employee, Kevin Burns, invented the two patents at issue in this case. The '040 and the '418 patents were entitled "Authoring System for Computer-based Information Delivery System" and were continuations of Burns's US Patent No 6,014,137 ("'137 patent"). In December 1994, Burns first completed a version of his kiosk authoring tool "reduc[ing] to practice the inventions claimed in the claims of the three patents." Doc #9, Ex 3 at 78:18-24. The '137, '040 and '418 patents were issued on January 11, 2000, October 1, 2002, and December 2, 2003, respectively.

The kiosk authoring tool that Burns designed using the '040 and '418 patents is a "multimedia kiosk authoring system for

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

use in developing and maintaining user interface screens for multimedia kiosk systems." Id, Exs 1-2. Burns designed the authoring system to "be used by persons with little or no experience in the intricate details of computer programming thereby making it easier for a large number of persons to set up kiosk interface screens." Doc #30-2, ¶3. The system "accomplishes this by providing pre-defined building blocks or screen elements (i e, pre-defined windows, buttons, and images) to be used in constructing an interface screen." Id. Burns described the invention as "a method used to build interface screens for a kiosk or computer system."

As an example, the patents explain the authoring tool might be used to create electronic kiosks used at ski resorts to provide information to customers about ski conditions, local hotels and restaurants through a touch screen or key pad. The patented invention is not the kiosk itself, but is the software for, and the method of, creating the kiosk.

B

The present litigation is not the first time Datamize and Plumtree have met on the patent battlefield. The roots of the present action between Datamize and Plumtree reach back to May 17, 2002. On that date, Datamize filed suit against Plumtree in the United States Court for the District of Montana in Missoula alleging infringement of the '137 patent (the "Montana action"). Ever ready a combatant, Datamize on this same date sent a letter to Plumtree informing it that:

> Datamize believes that Plumtree is infringing the '137 Patent by, among other things, providing software enabling the operation of portals and kiosks employing customization and

3

> personalization features.  We also believe that
> Plumtree will infringe the claims in the
> continuation patent application when it issues
> as a patent [the later issued '040 patent].
> From the prior communications, it does not
> appear that Plumtree has appreciated the
> implications of Datamize's patent rights.

Datamize's letter further informed Plumtree of the reasons behind the Montana action: "Because a direct assertion of patent infringement could subject Datamize to a declaratory judgment action by Plumtree in an inconvenient forum, [Datamize] has proceeded to preserve its rights by filing the attached Complaint in the United States District Court for the District of Montana (Missoula Division) where Datamize is located."  Doc #1, Ec at 2.  To demonstrate further that Plumtree would soon be infringing the '040 patent, Datamize also enclosed the thirty-eight allowed claims later issued as the '040 patent on October 1, 2002.

On November 23, 2002, Magistrate Judge Leif Erickson of the district court in Missoula issued a report and recommendation that the Montana action be dismissed for lack of personal jurisdiction over Plumtree.  In response to Magistrate Judge Erickson's report and recommendation, on December 4, 2002, Plumtree filed suit in this court seeking a declaratory judgment for non-infringement of the '137 patent ("DJ1").  DJ1 was assigned to the undersigned.  Plumtree agreed to stay DJ1 pending a ruling by a Montana district judge on the personal jurisdiction issue.  On July 8, 2003, Judge Donald Molloy adopted Magistrate Judge Erickson's findings and dismissed the Montana action for lack of personal jurisdiction.  On August 7, 2003, Datamize filed a motion to realign itself as plaintiff in DJ1.  The court granted realignment on October 6, 2003.

United States District Court
For the Northern District of California

On September 3, 2003, Datamize filed a patent infringement claim against nine online security brokerage firms in the Eastern District of Texas, Marshall Division, based on the '040 patent ("TX action"). On April 15, 2004, Datamize moved to add additional infringement claims in the TX action based on the '418 patent, which issued on December 2, 2003. The judge in the TX action subsequently allowed Datamize to add these additional claims. Plumtree, however, was <u>not</u> a defendant in the TX action. The parties inform the court that the TX action was resolved in 2005. Doc #63 at 3.

On March 31, 2004, Plumtree filed a motion for summary judgment in DJ1 claiming that the '137 patent was indefinite. On July 9, 2004, the court granted Plumtree's motion. On August 5, 2005, the Federal Circuit affirmed the court's grant of summary judgment in favor of Plumtree.

On the same day that this court granted Plumtree's motion for summary judgment in DJ1, Plumtree filed this action ("DJ2").

II

The construction of patent claims is a question of law to be determined by the court. <u>Markman v Westview Instruments, Inc</u>, 517 US 370, 372 (1996). The goal of claim construction is "to interpret what the patentee meant by a particular term or phrase in a claim." <u>Renishaw PLC v Marposs Societa per Azioni</u>, 158 F3d 1243, 1249 (Fed Cir 1998). "[T]he claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim." Id at 1248. The court may, if necessary, consult a variety of sources to determine the meaning of a claim term, including "the words of the claims

**United States District Court**
For the Northern District of California

themselves, the remainder of the specification, the prosecution history and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms and the state of the art."   <u>Innova/Pure Water, Inc v Safari Water Filtration Systems, Inc</u>, 381 F3d 1111, 1116 (Fed Cir 2004).  Also, the words of a claim "'are generally given their ordinary and customary meaning.'" <u>Phillips v AWH Corp</u>, 415 F3d 1303, 1312 (Fed Cir 2005) (citing <u>Vitronics Corp v Conceptronics, Inc</u>, 90 F3d 1576, 1582 (Fed Cir 1996)).  "The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i e, as of the effective filing date of the patent application."  Id at 1313.  See also <u>Brookhill-Wilk 1, LLC v Intuitive Surgical, Inc</u>, 326 F3d 1215, 1220 (Fed Cir 2003).

With these legal principles in mind, the court construes the disputed claim language of the patents.

## 1.  "Kiosk"

This term is located in claims 1-3, 5-13, 15, 16 and 27-29 of the '040 patent.  The parties dispute whether this term should be construed with the limitation that the computer delivery system be "generally accessible to some segment of the public."  Doc #66 at 6, Doc #70 at 5.  Datamize argues that "kiosk" refers to any stand-alone computer station "having a display screen and some form of input device."  To support its definition, Datamize argues that the term "kiosk" is "used in a 'broad sense to include stand-alone kiosks as well as general purpose computers configured to serve the same functions as a stand-alone kiosk.'"  Doc #66 at 6.  Plumtree

United States District Court
For the Northern District of California

argues that the term "kiosk" should be limited to include only computer delivery systems that are "generally accessible to some segment of the public." Plumtree cites language from the patent stating, "An electronic kiosk refers to a computer-based information delivery system generally accessible to some segment of the public for retrieving information or initiating transactions." '040 patent at 1:17-20. For the reasons given below, the court construes "kiosk" as "a computer-based interactive system that delivers information to a user in order to allow the user to make selections or initiate transactions."

Plumtree's proposed construction is problematic because the claim language does not require a kiosk to be "generally accessible to the public." While it is true that the kiosks most often are used to display and gather information in public areas, a kiosk does not cease to be a kiosk if it is placed in an area that is not generally accessible to the public – a point Datamize persuasively argued at the August 3 hearing. The words "generally accessible to some segment of the public" only describe a typical use of the kiosk, and in no way limit or require that the invention be accessible to a segment of the public. Plumtree argues that the '040 patent "teaches that kiosks may be found in a number of public settings such as 'museums, and exhibitions, airports, public transportation stations, banks * * *.'" Doc #70 at 6. As Datamize correctly points out, however, the claim language clearly states that the kiosk "may" be found in those locations, not that the kiosk "must be" or "is" found at those locations.

Datamize's proposed construction of a "general purpose computer or a stand-alone station having a display screen and some

7

United States District Court
For the Northern District of California

form of input device" is also problematic because it is too broad.
If Datamize's proposed construction were accepted, there would be
little difference between a kiosk and a standard, general purpose
computer.  A typical computer workstation has a display screen and
one or more input devices.  A kiosk is a more specialized version of
a standard computer and therefore should have narrower
specifications.  The claims describe an interactive system that can
deliver information to a user in order to make selections.  For
example, in claim 1, the language states that the invention is to
present "customized assortments of said information * * * [which
enable] a kiosk user to select one or more screen elements."  '040
patent at 20:7-27.

        Accordingly, the court finds that the function of a kiosk
is information retrieval and delivery, and construes "kiosk" as "a
computer-based interactive system that delivers information to a
user in order to allow the user to make selections or initiate
transactions."

2.  "Computer"

        This term is located in claims 14 and 30 of the '040
patent and in all claims of the '418 patent.  Doc #70 at 7.
Plumtree proposes "a general purpose computer configured to serve
the same function as a kiosk."  Doc #70 at 7.  Datamize contends
that "computer" as used in the patents does not need to be
construed.  Datamize also states that "[i]f the court agrees that
the function of a kiosk is retrieving information or initiating a
transaction, then Datamize does not object to Plumtree's proposed
construction of 'computer.'"  Doc #75 at 7.  Because "computer" is a

8

United States District Court
For the Northern District of California

1   term well-known by persons of ordinary skill in the art, the court

2   declines to construe it at this time.

3

4   3.  "[W]herein at least one of said screen elements permits limited
    variation in its on-screen characteristics in conformity with a

5   desired uniform look and feel" ('040 all claims)

6   "[S]aid screen elements having on-screen characteristics * * *
    providing a generally uniform look and feel with other interface

7   screens of said plurality of computers" ('418 all claims)

8            Datamize proposes that both of these clauses be

9   interpreted as "a degree of variation in [the kiosk's] on-screen

10  characteristics sufficiently limited to ensure that a user can

11  create customized screens that are generally uniform."  Doc #75 at

12  8.  Plumtree argues that the clause in the '040 patent should be

13  construed as "[t]he limited variation ensures that the resulting

14  interface screens have a look and feel that must be both desired and

15  uniform," and that the clause in the '418 patent should be construed

16  as "[t]he interface screens for all computers in the system all have

17  a 'generally uniform look and feel.'"  Doc #70 at 9.  Plumtree also

18  contends that the terms "limited variation" and "desired uniform

19  look and feel" are indefinite.  Id.  Plumtree argues further, in its

20  motion for summary judgment, that because the terms are indefinite,

21  the patents should be declared invalid.  See Doc #72.  The court

22  addresses the terms "limited variation" and "uniform look and feel"

23  in turn, followed by each of the two clauses.

24

25  a.  "limited variation"

26           The term "limited variation" appears in the '040 patent.

27  Datamize argues that this term should be construed as "a degree of

28  variation [of] on-screen characteristics sufficiently limited * * *

9

United States District Court
For the Northern District of California

1   *.″  Doc #75 at 8.  Plumtree argues, in its motion for summary

2   judgment, that the term is indefinite because it is vague and offers

3   no guidance in determining whether something falls in or out of the

4   boundaries set by the term "limited."

5         As recognized by both parties, "limited variation" is not

6   a technical term, but a term of general usage.  Doc #72 at 11; Doc

7   #77 at 14.  As stated above, words of a claim are generally given

8   their ordinary and customary meaning.  See <u>Phillips</u>, 415 F3d at

9   1312.  Plumtree argues that <u>Semmler v American Honda Motor Co</u>, 990

10  F Supp 967, 975 (SD Ohio 1997) and <u>Amgen, Inc v Chugai</u>

11  <u>Pharmaceuticals Co</u>, 927 F2d 1200 (Fed Cir 1991) support the argument

12  that "limited" is too vague.  Doc #77 at 15.  In <u>Semmler</u>, the term

13  in dispute was "considerable fuel savings."  See <u>Semmler</u>, 990 F Supp

14  at 967.  In <u>Amgen</u>, the dispute centered on the word "about" in the

15  term "about 160,000 IU/AU."  See <u>Amgen</u>, 927 F2d at 1200.  In both of

16  these cases, the terms were found to be indefinite.  Plumtree argues

17  that "limited" falls into the same category as the terms "about" and

18  "considerable" because there is a lack of precise guidance on when

19  exactly the variations fall outside the boundaries of "limited."

20  The court disagrees.

21        In <u>Playtex Products, Inc v Proctor & Gamble, Co</u>, 400 F3d

22  901, 907 (Fed Cir 2005), the Federal Circuit declined to impose a

23  numerical, or precise constraint on the term "substantially uniform

24  thickness."  Id.  The court also restated its holding from a prior

25  case that "'words of approximation, such as 'generally' and

26  'substantially,' are descriptive terms 'commonly used in patent

27  claims to avoid a strict numerical boundary to the specified

28  parameters.'"  Id (citing <u>Anchor Wall Sys v Rockwood Retaining</u>

10

United States District Court
For the Northern District of California

1   <u>Walls, Inc</u>, 340 F3d 1298, 1311 (Fed Cir 2003)).  Additionally, in

2   <u>Verve, LLC v Crane Cams, Inc</u>, 311 F3d 1116, 1120 (Fed Cir 2002), the

3   Federal Circuit held that claim language that accommodates minor

4   variations is not indefinite.  See also <u>Ecolab, Inc v Envirochem,

5   Inc</u>, 265 F3d 1358, 1366 (Fed Cir 2001).

6          Here, the term "limited" is not unlike terms such as

7   "generally" and "substantially."  Both "generally" and

8   "substantially" serve to create approximate boundaries, much in the

9   same way that "limited" does.  If the clause had instead stated "at

10  least one of said screen elements permits *substantial* variation in

11  its on-screen characteristics * * *," <u>Playtex</u> and <u>Anchor Wall</u> would

12  permit the clause, despite the lack of precise constraints.  Since

13  there is little difference in the function of the words

14  "substantial" and "limited" as a boundary, the court does not find

15  the term indefinite, and construes "limited variation" according to

16  its plain and ordinary meaning.  Accordingly, the court finds

17  "limited variation" to mean a "degree of variation of on-screen

18  characteristics sufficiently limited."

19

20  b.  "uniform look and feel"

21         The term "uniform look and feel" appears in both the

22  disputed clauses of the '040 and '418 patents.  Datamize argues that

23  the term "look and feel" is a collection, or set of on-screen

24  characteristics that creates a certain style.  See Doc #66 at 8-9.

25  Plumtree argues in its motion for summary judgment that the term is

26  vague and subjective.  Doc #72 at 6.

27         Plumtree contends that the term "uniform look and feel"

28  has several problems.  First, it contends that the term "look and

United States District Court
For the Northern District of California

1  feel" is vague because, "[t]wo people may have different opinions as

2  to what are the significant aspects of an interface screen that

3  constitute its 'appearance and functionality.'"  Id.  Plumtree

4  argues that the term is inexact, and therefore problematic.  Id.

5  Second, Plumtree maintains that the term "uniform" is also

6  problematic because "the claim requires a comparison between

7  different interface screens to determine whether they have the same

8  'look and feel,'" and that this comparison "is inherently

9  subjective" because the patents "provide no objective standard for

10 [determining] whether the 'look and feel' of different interface

11 screens is 'uniform.'"  Id.

12          With respect to the term "uniform," the court is guided by

13 Cordis Corp v Medtronic AVE, Inc, 339 F3d 1352 (Fed Cir 2003).  In

14 Cordis, the disputed claim term was "substantially uniform

15 thickness."  Id at 1360.  The Federal Circuit addressed the term and

16 held that it did not require a numerical restriction on the

17 "substantially uniform" limitation.  Id at 1362.  Notably, the

18 Federal Circuit allowed the term to be construed, raising no

19 objection that "uniform" was vague or indefinite.  Similarly, in

20 Ecolab, 265 F3d at 1366, the Federal Circuit held that the term

21 "substantially uniform" was not indefinite.  Based on the fact that

22 the Federal Circuit scrutinized a term with the word "uniform" (at

23 least twice) and made no objections to the word, this court finds

24 that the term "uniform" in "uniform look and feel" does not render

25 the claim indefinite.

26          Plumtree's argument that the term "look and feel" is

27 subjective is also unpersuasive.  As Datamize argues in its response

28 to Plumtree's summary judgment motion, the "look and feel" of a

United States District Court
For the Northern District of California

screen is defined by the specifications.  Doc #77 at 10.  The "look and feel" of the resulting screens are outputs of a program.  One can look to the source code to see what elements, along with their positions on the screen, constitute a given output.  It follows that these elements and their positions and functions are what give the resulting screen its "look and feel."  These characteristics can easily be determined.  Accordingly, the term "look and feel" is not indefinite.

Furthermore, as stated above, the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art.  Phillips, 415 F3d at 1313. The term "look and feel" is a term that is readily known and recognized by a person of ordinary skill involved in software use and development.  The court finds persuasive Datamize's response, which points out that Plumtree itself distributes literature that uses the term "look and feel" in connection with Plumtree products. Doc #77 at 19-22.

Having found that the terms "limited variation" and "uniform look and feel" are not indefinite, the court now addresses the proper construction for the two disputed clauses.  Because the language of the two clauses contain no technical terms, but only terms of general usage, the court adopts a construction that is in line with the plain and ordinary meaning of the words.  The proposed construction by Datamize meets this standard, and so the court adopts this construction – "a degree of variation in its on-screen characteristics sufficiently limited to ensure that a user can create customized screens that are generally uniform" – for both clauses.

13

**United States District Court**
For the Northern District of California

1

2    4.  **"Element(s)" ('040 and '418 patents)**

3           This term is located in both the '040 and the '418

4    patents.  Datamize's proposed construction is "a window; a

5    background image or artwork for providing a backdrop for a window or

6    for background within a window; a button; a hot spot or area on the

7    screen for activating actions, a test string; a video clip; an audio

8    clip; a slide sequence; an animation sequence; or NAV object."  Doc

9    #66 at 11.  Plumtree proposes that "element" be construed as "an

10   item that appears on an interface screen (such as a button)."  Doc

11   #70 at 11.

12          Datamize argues that "element" should be construed "as

13   explicitly defined in the specification."  Doc #66 at 11.  Datamize

14   cites claim language which states, in relevant part:

15          [A] given screen will include a variety of elements for
            presentation to a user such as one or more windows, one or
16          more background images or artwork for providing a backdrop
            for a window or for background within a window, a number
17          of buttons; a number of 'hot spots,' ie, areas on a screen
            for activating actions, text strings, video clips, audio
18          clips, slide sequences, or animation sequences.

19   '040 patent at 6:21-28, Doc #66 at 11.  As Plumtree correctly points

20   out, the cited language only gives examples of what an element could

21   be.  The claim language neither restricts nor limits "element" to

22   the listed examples.  Because there is no intrinsic evidence that

23   limits or restricts the term to the uses cited by Datamize, the

24   court adopts a definition more in line with the plain meaning of the

25   word, and construes "element" as "a visual or audio item presented

26   to the user."

27   \\

28   \\

**United States District Court**
For the Northern District of California

5.  "Kiosk user," "computer user," "user at an individual computer." ('040 patent).

The term "kiosk user" is found in claims 1-3, 5-13, 15, 16, 27 and 30 of the '040 patent.  Doc #66 at 12.  The term "computer user" is found in claim 30 of the '040 patent.  Id.  The term "user at an individual computer" is found in claims 14 through 26 of the '040 patent.  Id.  Plumtree proposes all three of the terms to mean "[t]he end-user of a kiosk/computer."  Datamize argues that these terms do not need to be construed.  If they are to be construed, Datamize proposes that "kiosk user" and "computer user" be construed as a "user of a kiosk/computer," and that "user at an individiual computer" be construed as "an end-user of a kiosk/computer."  For the reasons stated below, the court declines to construe the terms.

The dispute, or confusion, over the term "user" arises because the patentee has used the word "user" to refer to both the person using the patented invention to create the kiosk systems and the person using the kiosk.  For example, claim 14 of the '040 patent states, in part:

> [E]nabling a user at an individual computer of said plurality to select one or more screen elements from said predefined screen element plurality and to select on-screen characteristics of said at least one screen element permitting limited variation in its on-screen characteristics * * *.

'040 patent at 21:41-46.  Here, the word "user" is used to refer to a person that is using the invented method of creating screens for kiosk systems.  In contrast, claim 27 of the '040 includes the word "user" to refer to the end-user of the kiosk system, stating that the interface screen "will have a uniform look and feel and be

15

**United States District Court**
For the Northern District of California

functionally operable for effective delivery of information to a kiosk user."  '040 patent at 23:7-10.

Datamize contends that the phrases "kiosk user," "computer user," and "user at an individual computer" do not have any special definitions and argues that there is no basis for Plumtree's assertion that all three of the phrases have to mean the same thing (ie "the end-user of kiosk/computer").  Doc #75 at 10.  Plumtree argues that the term "kiosk user" and "computer user" must mean the same thing throughout the patent.  Plumtree cites <u>Fin Control Systems Pty v OAM, Inc</u>, 265 F3d 1311, 1318 (Fed Cir 2001) and <u>Omega Engineering, Inc v Raytek Corp</u>, 334 F3d 1314, 1334 (Fed Cir 2003) to support its argument that unless otherwise stated, the same claim term in the same patent carries the same meaning.  Doc #70 at 13.  Plumtree argues that there is "no evidence * * * that the patentee intended 'user' to mean both 'end-user' and 'system author.'"  Id.  This argument fails, however, because the patent language explicitly uses the word "user" to refer to both the user of the kiosk and the user of the kiosk-designing system.  There is no reason here why the term "user" cannot refer to both groups.  Restricting and confining the term "user" to just one construction would be akin to saying that the word "maker" could not apply to both a person making carpentry tools, and a person who uses the tools to make tables.  Of course, a patentee can certainly limit, or even change, the meaning of a common word, but that is not the case here.

Moreover, the use of the term "user" to refer to both groups of people does no violence to the plain and ordinary meaning of the word, nor does it stretch the intentions of the patentee at

United States District Court
For the Northern District of California

1  the time that the patent was filed.  See Phillips, 415 F3d at 1312-

2  13.

3          Accordingly, the court declines to construe the terms

4  "kiosk user," "computer user," and "user at an individual computer."

5

6  6.  "Master database" ('040 patent)

7          The term "master database" is found in claims 27-30 of the

8  '040 patent.  Datamize proposes "database" to mean "an organized

9  collection of data," and a "master database" to mean "a controlling

10 database."  Doc #66 at 14.  Plumtree's proposed construction for

11 "master database" is "[a] collection of information containing all

12 or substantially all of the information content that can be

13 displayed on any kiosk in the kiosk system."  Doc #70 at 13.  The

14 actual claim language states, in part:

15         * * * providing a master database of information from said
           plurality of information providers, said master database
16         referencing information content from said providers to be
           displayed on any of said plurality of kiosks * * *
17

18 '040 patent at 22:44-47.

19         The court fails to see how Datamize's construction,

20 "controlling database," is an adequate definition.  Datamize does

21 not explain exactly what it is that the "master database" is

22 controlling.  In its opening brief, Datamize states, "the master

23 database of the '040 patent is a controlling database, referencing

24 or containing the information content that may potentially be used

25 throughout the kiosk system."  Doc #66 at 15.  Yet, neither Datamize

26 nor the claim language make any reference to anything being

27 controlled by the "master database."  In fact, there is no mention

28

17

**United States District Court**
For the Northern District of California

1  in the patent language of any kiosk system having more than one

2  database.

3      The patent language describes a "master database" as a

4  collection of information from which the kiosk system can pull up

5  information to be displayed on its screens.  '040 patent at 22:44-

6  47.  This database can reside on a remote server, where information

7  retrieval by the individual kiosks would take place over a network,

8  or it can reside on the kiosk system itself.  '040 patent at 4:65-

9  5:3; 19:31-34.  In either case, the database would contain all of

10  the information necessary for the kiosk system, supporting

11  Plumtree's construction.

12      Plumtree's proposed construction is also supported by the

13  prosecution history of the '137 patent and the specification of the

14  '040 patent.  During the prosecution of the '137 patent, Datamize

15  attempted to distinguish certain of its pending claims from the

16  Consolatti patent by requiring that those claims include the step of

17  "providing a master database of information."  Consollati discloses

18  an authoring tool for creating computer interface screens.  Doc #71,

19  Ex A at 2:43-45.  According to Datamize:

20          The present invention relies on a database that is
           integral to the authoring system and that had no
21          counterpart in Consolatti.  The database contains all, or
           at least substantially all, the information content needed
22          for all the kiosks of the system.  The present invention
           defines interface screens in part by executing queries in
23          the database to achieve such tasks as determining how many
           buttons are needed on certain interface screens to access
24          information content and associating items of information
           content with button actions.

25  Doc #71, Ex B at 6.  Plumtree's construction of "master database"

26  incorporates the very words used by Datamize to distinguish

27  Consolatti.  "When multiple patents derive from the same initial

28  application, the prosecution history regarding a claim limitation in

18

any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation." <u>Biovail Corp Intern v Andrx Pharmaceuticals, Inc</u>, 239 F3d 1297, 1301 (Fed Cir 2001) (citing <u>Jonsson v The Stanley Works</u>, 903 F2d 812, 817-18, 14 USPQ2d 1863, 1868 (Fed Cir 1990)).

Moreover, the specification of the '040 patent explicitly states "[t]o implement the kiosk system, a database of all information to be displayed at any individual kiosk is constructed." '040 patent at 14:23-25.  The specification then indicates that the system need not include a central database server but may simply have each kiosk of the system store the entire database of information available to kiosks in the system (i e, the master database).  '040 patent at 4:60-5:3, 19:31-58.  This would not be feasible if the master database did not contain the entirety of the information needed for the kiosk system, but merely referenced information contained in other databases.

Finally, Plumtree's construction is more in line with the plain and ordinary meaning of the term "master database," and closer to the meaning it would have to a person of ordinary skill in the art.  A person familiar with the technology described in these patents would take "master database" to mean a database that contains all of the information required by the system.

Accordingly, the court adopts Plumtree's proposed construction and construes the term "master database" as "a collection of information containing all or substantially all of the information content that can be presented on any kiosk in the kiosk system."

19

United States District Court

For the Northern District of California

7.   "Object" ('418 patent)

          The term "object" appears numerous times in the '418 patent.  Datamize proposes that an "object" is "an instance of data derived from an associated object oriented program."  Doc #70 at 14. Plumtree proposes "object" to mean "an item appearing on a display screen that can be individually selected and manipulated."  Id.  For the reasons given below, the court declines to construe the term "object."

          Plumtree argues that adopting Datamize's proposed construction would be "import[ing] the extraneous notion of object-oriented programming."  Doc #70 at 15.  Plumtree contends that there is "no intrinsic evidence that would suggest that 'object' can only be 'an instance of data derived from an associated object oriented program'" and that "object" should be construed in a similar fashion as "element."  Id.  Datamize argues, however, that the term "object" is used by the patentee in the same manner as it is commonly used in object oriented programming.  Doc #75 at 12.

          "In construing patent claims, the court must apply the same understanding as that of persons knowledgeable in the field of the invention. 'Patents are written not for laymen, but for and by persons experienced in the field of the invention.'"  Merck and Co v Teva Pharmaceuticals USA, Inc, 347 F3d 1367, 1370 (Fed Cir 2003) (citing Voice Techs Group, Inc v VMC Sys, Inc, 164 F3d 605, 615 (Fed Cir 1999)).  Here, a person of ordinary knowledge and skill in the art would know that the patentee was using the term "object" as it is used in object oriented programming.  In object oriented programming, an "object" is an instance of a class.  A class is a combination of definitions for different characteristics.  An object

United States District Court
For the Northern District of California

is the embodiment of particular versions of the different

characteristics.  The claim language clearly indicates that the

patentee had this usage in mind in using the term.  In both the '040

and the '418 patents, the language states that "[t]he authoring

system uses the methods of object oriented programming.  The system

is specified by the following Object Class Definition Tables."  '040

patent at 6:37-40; '418 patent at 6:40-42.  The claim language also

shows that the patentee used the term "object" in the same manner

that he used the term "element."  For example, the specifications

state: "* * * [the] item can be removed from the definition table

and the affected interface screen re-defined to remove any buttons

or other objects that may have been associated with the sold-out

item."  '418 patent at 21:39-42.

        Accordingly, the court declines to construe the term at

this time and leaves it to be determined by its context as it

appears in the claim language.


8.  Whether claims 24 and 36 of the '418 patent are method or
apparatus claims

        Plumtree argues that claims 24 and 36 of the '418 patent

are method claims.  Doc #70 at 15.  Datamize contends that the two

claims are apparatus claims.  Doc #75 at 13.

        A method claim recites a series of steps or actions, while

an apparatus claim recites a tangible item.  See In re Kollar, 286

F3d 1326, 1332 (Fed Cir 2002).

        Claim 24 of the '418 patent states, in part:

    A computer program storage medium readable by a computing
    system and encoding a computer program for executing a
    computer process for providing customized assortment of
    information content from a plurality of information

providers for display in one or more customized interface
screens in a plurality of computers * * *

'418 patent at 24:5-10.  Claim 36 of the '418 patent states, in
part:

A computer program storage medium readable by a computing
system and encoding a computer program for executing a
computer process for providing customized assortment of
information content from a plurality of information
providers for display in one or more customized interface
screens in a plurality of computers, the computer process
comprising:

enabling selection of said a customized assortment of
information content for a first computer of said
plurality from information content from said plurality of
information providers * * *

'418 patent at 25:14-23.

Plumtree argues that these claims are method claims
because the claim language seems to describe a process, or a series
of steps that are performed by the invention.  Doc #70 at 15.  In
the alternative, Plumtree argues that the claims are indefinite
because they contain characteristics of "both a method * * * and an
apparatus."  Id.  Plumtree cites IPXL Holdings, LLC v Amazon, Inc,
430 F3d 1377, 1384 (Fed Cir 2005) to support its argument that such
claims should be declared invalid for indefiniteness.  Id.  Datamize
contends, however, that the claim language is not indefinite, and
that the claims are apparatus claims.  Datamize points to the claim
language stating "[a] computer program storage medium" to support
its argument that these claims describe a tangible item and are
therefore apparatus claims.  Doc #75 at 13.

The court first notes that the claims are not models of
clarity.  The claims start out describing a tangible item ("computer
program storage medium").  As Datamize points out, all examples of

United States District Court
For the Northern District of California

computer program storage meda, like floppy disks, CDs or DVDs, are tangible items. Doc #75 at 13. If the claim language ended there, there would be no dispute that the claims are apparatus claims. The claim language continues, however, and in so doing, also appears to describe a process:

> * * * encoding a computer program for executing a computer process for providing customized assortment of information content from a plurality of information providers for display in one or more customized interface screens in a plurality of computers, the computer process comprising:
>
> enabling selection of said a customized assortment of information content for a first computer of said plurality from information content from said plurality of information providers * * *

'418 patent at 25:14-23.

From the court's perspective, the claim language describes a tangible item that stores a program. Thus the claims appear to be apparatus claims. The claim language also describes the design and the function of the program that is stored on the tangible item. Given the process described by the claim language, these claims appear simultaneously to state method claims, making them so-called "hybrid" claims. See Claim Construction in the Federal Circuit (Thomson West 2006) at 55-57.

Plumtree contends that such claims are invalid for indefiniteness, citing IPXL Holdings, 430 F3d 1377 (Fed Cir 2005). In IPXL Holdings, the disputed claim described a "system," but also included steps on how a user might use that system. 430 F3d at 1384. The Federal Circuit held that it was unclear whether "infringement occurred when one creates the system * * * or whether infringement occurs when the user actually uses the [system]." Id. This ruling, however, is unclear in its application to the present

United States District Court

For the Northern District of California

case. The ruling does not state whether *any* claim that contains both method and apparatus descriptions is ipso facto invalid for indefiniteness. It merely states that such language is problematic if it does not adequately inform the public of where infringement occurs.

The Federal Circuit has held that "process steps can be treated as part of a product claim if the patentee has made clear that the process steps are an essential part of the claimed invention." <u>Andersen Corp v Fiber Composites, LLC</u>, 474 F3d 1361, 1375 (Fed Cir 2007). Here, it is clear that the process steps are an essential part of the claim. The claim language describes in great detail the program, or the process, that is to be stored on the "computer program storage medium." The storage medium takes its character from its function and capacity to store a program that carries out these precise steps. See also <u>Sandisk Corp v Memorex Products, Inc</u>, 415 F3d 1278 (Fed Cir 2005) (Court dealt with method claim having a significant preamble setting forth apparatus features of a computer system in which the claimed method is practiced).

<u>Collaboration Properties, Inc v Tandberg ASA</u>, 2006 WL 1752140 (ND Cal) is also instructive. In <u>Tandberg</u>, Judge Patel, of this district, found that <u>IPXL Holdings</u> stood for the narrow rule that a single claim "may not purport to cover a system, independent of any use of the system, and simultaneously purport to cover a particular use of the system." Id at 7. That is not the case here. The claim language describes a tangible item that is defined by certain steps, essential to the claimed invention.

Accordingly, the court finds that claims 24 and 36 are apparatus claims.

**United States District Court**
For the Northern District of California

III

A

The court turns to Plumtree's motion for summary judgment. Doc #72. The summary judgment standard is the same in a patent case as in any other case. <u>Union Carbide Corp v American Can Co</u>, 724 F2d 1567, 1571 (Fed Cir 1984). In deciding a summary judgment motion, the court must determine whether genuine issues of material fact exist, resolving any doubt in favor of the party opposing the motion. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v Liberty Lobby, Inc</u>, 477 US 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id.

The burden of establishing the absence of a genuine issue of material fact lies with the moving party. <u>Celotex Corp v Catrett</u>, 477 US 317, 322-23 (1986). When the moving party has the burden of proof on an issue, the party's showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party. <u>Calderone v United States</u>, 799 F2d 254, 258-59 (6th Cir 1986). Summary judgment is granted only if the moving party is entitled to judgment as a matter of law. FRCP 56(c).

\\

\\

\\

\\

United States District Court
For the Northern District of California

B

Plumtree requests summary judgment "that the '040 and the '418 patent claims are invalid on the ground that, as a matter of law, the terms 'limited variation' and 'desired uniform look and feel' of the '040 patent, and 'pre-defined constraints' and 'generally uniform look and feel' of the '418 patent are indefinite under 35 USC § 112, ¶2." Doc #72 at 1.

Every patent's specification must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 USC 112 ¶2 (2000). "Because the claims perform the fundamental function of delineating the scope of the invention, the purpose of the definiteness requirement is to ensure that the claims delineate the scope of the invention * * *" Datamize, LLC v Plumtree Software, Inc, 417 F3d 1342, 1347 (Fed Cir 2005) (internal citations omitted). "The definiteness requirement, however, does not compel absolute clarity. Only claims 'not amenable' to construction' or 'insolubly ambiguous' are indefinite. * * * Furthermore, a difficult issue of claim construction does not ipso facto result in a holding of indefiniteness." Id. "If the meaning of the claim is discernable, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds." Exxon Research & Eng'g v United States, 265 F3d 1371, 1375 (Fed Cir 2001). The courts are required to "accord respect to the statutory presumption of validity, and [] protect the inventive contribution of patentees, even when the drafting of their patents has been less than ideal." Id at 1374-75.

United States District Court

For the Northern District of California

1   In doing so, the court follows "the requirement that clear and

2   convincing evidence be shown to invalidate a patent."  <u>Datamize</u>, 417

3   F3d at 1348.  See also <u>Budde v Harley-Davidson, Inc</u>, 250 F3d 1369,

4   1376 (Fed Cir 2001).

5                                    1

6          Plumtree's first argument is that the term "uniform look

7   and feel" is indefinite.  Doc #72 at 6.  Plumtree argues that

8   "uniform look and feel" is subjective, and that the intrinsic

9   evidence does not "save" "uniform look and feel."  Doc #72 at 7.

10  Plumtree also argues that Datamize has conceded that "uniform look

11  and feel" is subjective, and that Datamize's proposed construction

12  is also subjective.  Doc #72 at 10.

13         As stated above, the court finds that the term "uniform

14  look and feel" is not indefinite.  It is too late in the day of

15  computer-related terminology to find that "look and feel" does not

16  have a well understood meaning in that particular field.  See <u>Apple</u>

17  <u>Computer, Inc v Microsoft Corp</u>, 35 F3d 1435, 1439 (9th Cir 1994)

18  (Graphical user interfaces "are thought of as the 'look and feel' of

19  a computer").  Plumtree's argument that the term "uniform" is

20  subjective, and therefore indefinite, is unpersuasive.  "Uniform"

21  has been addressed by the Federal Circuit and upheld.  The Federal

22  Circuit has looked at the term "uniform" in a similar context, and

23  did not find it to be vague, overly subjective or indefinite.  See

24  <u>Cordis</u>, 339 F3d at 1360; see also <u>Ecolab</u>, 265 F3d at 1366.  The term

25  "look and feel" is subject to a reasonable construction because the

26  specification of the system contains the requisite definitions to

27  notify others of the elements and components that constitute "look

28  and feel."

United States District Court
For the Northern District of California

**2**

Plumtree also argues that the term "limited variation" is indefinite.  Doc #72 at 11.  Plumtree contends that the intrinsic evidence does not save "limited variation" and that neither the specifications nor the prosecution history provide helpful guidance.  Id.  Finally, Plumtree argues that the existing case law supports the argument that "limited variation" is indefinite.

As the court discussed above, the term "limited variation" is not indefinite.  The term "limited" serves to create a boundary to the amount of variation allowed and/or required by the claim.  The Federal Circuit has upheld use of such words in other cases.  See Playtex, 400 F3d at 907.  Because the term "limited variation" is a term of general usage, the court is not hampered by the absence of intrinsic evidence or prosecution history, and adopts the plain meaning.

**3**

Lastly, Plumtree argues that the term "predefined constraints" is indefinite.  Doc #72 at 13.  Plumtree contends that the claim language provides no guidance on "how constrained the choices [in creating the screens] should be."  Id.  The court finds no basis for this argument.

The relevant claim language states, "* * * said screen elements having on-screen characteristics subject to pre-defined constraints providing a generally uniform look and feel with other interface screens of said plurality of computers."  '418 patent at 22:28-31.  As the language shows, the term "predefined constraint" means a boundary that is set in advance, either by the system or by

28

**United States District Court**
For the Northern District of California

the system designer, for a particular screen element.  Accordingly, the language is not indefinite.


IV

In sum, the court has construed or clarified the construction of the disputed terms of the '040 and '418 patents according to the patents' plain language, the intrinsic record and the Federal Circuit's guidance.  Notwithstanding any further orders the court may make regarding claim construction, this order shall be deemed to be the "claim construction order" for scheduling purposes.

Finally, for the reasons above, Plumtree's motion for summary judgment (Doc #72) is DENIED.  Datamize's motion to supplement the record in opposition to summary judgment (Doc #85) is DENIED AS MOOT.


SO ORDERED.

_____

VAUGHN R WALKER

United States District Chief Judge

29

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28